1  GLENN E. SOLOMON (State Bar No. 155674)
ERIC D. CHAN (State Bar No. 253082)
2  **HOOPER, LUNDY & BOOKMAN, P.C.**
1875 Century Park East, Suite 1600
3  Los Angeles, California 90067-2517
Telephone: (310) 551-8111
4  Facsimile: (310) 551-8181
E-Mail:  gsolomon@health-law.com,
5  echan@health-law.com

6  Attorneys for REGIONAL MEDICAL CENTER
OF SAN JOSE

7

8  **UNITED STATES DISTRICT COURT**

9  **NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

10

11  REGIONAL MEDICAL CENTER OF SAN
JOSE,
12
                    Plaintiff,
13
        vs.
14
WH ADMINISTRATORS, INC.; RHC
15  MANAGEMENT HEALTH & WELFARE
TRUST; RHC MANAGEMENT CO., LLC
16  d/b/a/ MCDONALD'S; BENEFIT
ADMINISTRATIVE SYSTEMS, LLC; THE
17  PHIA GROUP, LLC,

18                  Defendants.

19

Case No.

**COMPLAINT FOR:**

1.  **BENEFITS UNDER SECTION
    502(a)(1)(B) OF THE EMPLOYEE
    RETIREMENT INCOME
    SECURITY ACT (ERISA)**

2.  **AFFORDABLE CARE ACT
    SECTION 2707(b) (OUT OF
    POCKET MAXIMUM), VIA ERISA
    SECTION 502(a)(1)(B)**

3.  **INTENTIONAL
    MISREPRESENTATION**

4.  **NEGLIGENT
    MISREPRESENTATION**

5.  **INTENTIONAL INTERFERENCE
    WITH CONTRACTUAL
    RELATIONS**

**DEMAND FOR JURY TRIAL**

20

21

22

23

24

25

26

27

28

**HOOPER, LUNDY & BOOKMAN, P.C.**
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1230591.1

COMPLAINT

Plaintiff Regional Medical Center of San Jose (the "Hospital") alleges as follows:

1.     This lawsuit arises from the failure to properly pay the Hospital for the extensive medical care provided to a very ill woman ("Patient").[1]  The Hospital is informed and believes that in 2015, Patient was a beneficiary of the RHC Management Health & Welfare Plan (the "Plan"). Patient had an accident and was admitted for what became a nearly one-month stay.  The Hospital's bill for Patient's care totaled $892,269.79.  But the Plan and/or its representatives instead paid the Hospital just $73,043.32 – a mere 8% of the Hospital's bill, leaving the Patient exposed to pay the rest.

2.     Notwithstanding numerous appeals by the Hospital, the Plan has refused to pay a cent more.  The refusal by the Plan to pay this bill appropriately was caused by the improper conduct of Defendants on multiple levels.

3.     As described more fully herein, Defendants caused this substantial underpayment through a calculated scheme to circumvent, among other things, the following:

      a.     The Maximum Out-of-Pocket (MOOP) limitation that is set forth in the Plan's own plan documents for calendar year 2015;

      b.     The MOOP limit that the federal Affordable Care Act ("ACA") imposed upon the Plan in 2015;

      c.     The requirement under ERISA that plan documents be written in a manner calculated to be understood by the average plan participant; and

      d.     The representations made by the Defendants or their representatives to the Hospital during the Patient's stay to verify and authorize the coverage.

---

[1] The patient's name is not included to protect privacy.  But the Hospital has engaged in communications with all of the Defendants about the Patient, and is informed and believes they all know from the allegations contained in this Complaint the identity of the Patient.  The Hospital also can and will provide confirming identifying information to the defendants and the Court outside the context of a public filing and/or pursuant to a Court order.

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

COMPLAINT

**JURISDICTION AND VENUE**

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1331, because the action arises under the laws of the United States; and pursuant to 29 U.S.C.

§ 1132(e)(1), because the action seeks to enforce rights under the Employee Retirement Income

Security Act ("ERISA"); and supplemental jurisdiction pursuant to 28 U.S.C. § 1367, because

there is a common nucleus of facts relating to Defendants' wrongful decision to underpay the

Hospital for the extensive medical services it provided to Patient.

5.      The San Jose Division of the United States District Court for the Northern District

of California is the appropriate venue for the filing of this case pursuant to Northern District Local

Rules 3-2(c) (Assignment to a Division) and 3-2(e) (San Jose), because a substantial part of the

events or omissions which give rise to the Hospital's claims occurred in Santa Clara County.

**THE PARTIES**

6.      Plaintiff Regional Medical Center of San Jose is a highly-respected acute care

hospital located in Santa Clara County, California – one of the most well regarded hospitals in its

geographic region.  The Hospital is an acute-care hospital that offers a comprehensive array of

inpatient and outpatient services. Its six Centers of Excellence include Emergency and Trauma,

Cardiovascular, Women and Children's Health, Neurosciences, Cancer Care and Medical/Surgical

Services. With an employed staff of 1,540 and a medical staff of more than 500 professionals

specializing in 21 fields of medicine, dentistry and podiatry, the Hospital offers world-class

healthcare to residents throughout the greater San Jose / Silicon Valley community.  Since 1965, it

has been a provider of essential health care services in the San Jose area.  Among other accolades,

the Hospital has been recognized by Healthgrades, a leading online resource for comprehensive

information about physicians and hospitals, for the following honors: America's 100 Best Cardiac

Care 2015-2017, America's 100 Best General Surgery 2017, America's 100 Best Coronary

Intervention 2017, Cardiac Care Excellence Award 2015-2017, Stroke Care Excellence Award

2016/2017, Cranial Neurosurgery Excellence Award 2016/2017, Treatment of Sepsis-5-star

recipient 2012-2017, and Treatment of Heart Attack-5-star recipient 2017.

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1230591.1

7.     On information and belief, Defendant RHC Management Health and Welfare Trust (referred to herein as the "Plan") is a self-funded ERISA health benefits plan, and a proper defendant pursuant to ERISA § 502(d), 29 U.S.C. § 1132(d).  "Self-funded" means that the Plan is not directly operated pursuant to one or more contracts for health insurance.  Rather, it is directly responsible for the medical benefits paid pursuant to the Plan.  The Hospital is informed and believed that Patient was a beneficiary of the Plan during at least calendar year 2015 when the services were rendered by the Hospital.

8.     On information and belief, Defendant WH Administrators, Inc. is the Plan's designated Plan Administrator and Named Fiduciary.  However, Hospital is informed and believes that Defendant WH Administrators, Inc. may have delegated most or all of its fiduciary duties under the plan to other Defendants, although the complete facts regarding the relationship between the Defendants remains unclear at this time.

9.     On information and belief, Defendant Benefit Administrative Systems, LLC ("BAS") is the claims administrator for the Plan, and has handled at least some levels of appeals taken by the Hospital from the Plan's initial adverse benefit decision, and appears to have acted in some respects in the capacity of a *de facto* Plan Administrator, although the complete facts regarding the relationship between the Defendants remains unclear at this time.

10.     On information and belief, Defendant The Phia Group, LLC is a Limited Liability Company with its headquarters in Braintree, MA.  The Hospital is further informed and believed that The Phia Group has been working behind the scenes to encourage Defendants to improperly interpret the terms of the Plan so as to deny fair payment to the Hospital, including to ensure that the MOOP limitation is not enforced in the manner required by ACA.  The complete facts regarding the relationship between the Defendants remain unclear at this time.

11.     On information and belief, Defendant RHC Management Co., LLC is a California corporation with its corporate headquarters located in Salinas, CA.  Plaintiffs are informed and believe that Defendant RHC Management Co., LLC, is the corporate entity that owns and operates one or more McDonald's franchise restaurants in the Salinas, CA area.  Plaintiffs are further informed and believe that Defendant RHC Management Co., LLC, is the sponsor of the Plan, and

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1230591.1

1  may have acted in some respects in the capacity of a *de facto* (and/or Named) Plan Administrator,

2  although the complete facts regarding the relationship between the Defendants remain unclear at

3  this time.

4      12.    The manner in which the Defendants have conducted themselves when

5  communicating about the bill for the services to the Patient has made it difficult if not impossible

6  to determine which of them really is the Plan Administrator and/or whether more than one of them

7  share some of the Plan Administrator responsibilities such that one or more of them have become

8  in part or in full the *de facto* Plan Administrator.  The complete facts regarding the relationship

9  between the Defendants remain unclear at this time.

10     13.    The manner in which the Defendants have conducted themselves when

11  communicating about the bill for the services to the Patient has made it difficult if not impossible

12  to determine which of them has authority to speak for the Plan and/or for each other, and whether

13  they are agents of one another, independent contractors of one another, or what other status they

14  have to each other.  For example, the other Defendants refused to answer the Hospital's request

15  that they state what status The Phia Group has to each of them.  The complete facts regarding the

16  relationship between the Defendants remain unclear at this time.

17     14.    The true names and capacities of the defendants sued herein as DOES are unknown

18  to Hospital at this time, and Hospital therefore sues such defendants by such fictitious names.

19  Hospital is informed and believe that the DOES are those individuals, corporations and/or

20  businesses or other entities that are also in some fashion legally responsible for the actions, events

21  and circumstances complained of herein, were the agents, representatives, or employees of the

22  other defendants, and may be financially responsible to Hospital for the services it has provided to

23  the Patient.  The Complaint will be amended to allege the DOES' true names and capacities when

24  they have been ascertained.

25     15.    The Defendants named above, along with the DOES, will be collectively referred to

26  herein as the "Defendants."

27

28

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

**GENERAL ALLEGATIONS**

**The Plan's Clear and Unambiguous MOOP Limitation**

16.     After the services had been rendered, and during the appeals process, Defendants first provided to the Hospital a document titled "Plan Document and Summary Plan Description for RHC Management Health and Welfare Trust, PPACA Bronze Plan," which stated an effective date of January 1, 2015.  Defendants have tried to use isolated cites to portions of this document to bolster their improper assertion of undisclosed alleged limitations, exclusions, and incorrect interpretations of the actual coverage set forth in the document and required by federal law.  For purposes of this Complaint, the Hospital assumes that what Defendants provided as the plan document is correct and complete.  This document also is referred to herein as a Summary Plan Description ("SPD").

17.     The SPD expressly states a MOOP limit of $6,350 for individual beneficiaries. Specifically, it states that "[i]f, in a Calendar Year, a Covered Person accumulates an Out-of-Pocket amount which equals [$6,350], the Plan will pay 100% of any further Covered Medical Expenses incurred during the remainder of that Calendar Year." (SPD at p. 27.)  Health plans have a MOOP limitation in order to ensure that beneficiaries like the Patient are not subject to crippling financial liability in the case of health high care bills in a single year.  $6,350 was *supposed* to represent the upper limit of what the Patient could be required to pay in calendar year 2015. Instead, the Plan's failure to pay more than 8% of the bill left the Patient on the hook for the bill's remainder, which is far more exposure than the SPD's stated MOOP limit.

**The Affordable Care Act Also Imposes a MOOP Requirement**

**on Essential Health Benefits Under the Plan**

18.     Additionally, ACA establishes MOOP requirements with respect to Essential Health Benefits ("EHBs") offered by health plans.  EHBs include items and services in ten general categories, including hospitalization and emergency services. *See* ACA Section 1302(b).  All of the services that the Hospital rendered to the Patient fit within one or both of these two EHBs.

19.     As part of ACA, starting in the year 2014 and thereafter, the federal government

has required plans like this one to have a MOOP with respect to all offered EHBs.  Congress

enacted this MOOP requirement to prevent plans like this one from purporting to offer coverage

that turns out not be adequate when a beneficiary requires extensive health care.  Accordingly,

*even if* the Plan did not have a $6,350 MOOP, the Plan would have been required by federal law to

have a MOOP no higher than the one set by ACA with respect to all offered EHBs.  In the year

2015, ACA set a MOOP of no more than $6,600.  Accordingly, even if the Plan did not expressly

include a $6,350 MOOP limit, it would have been required by law to have a MOOP applicable to

all EHBs no higher than $6,600.[2]

20.     ACA's MOOP limitation requirement is found in Section 2707 of the Public Health

Service Act, captioned "Comprehensive health insurance coverage" (42 U.S.C. §300gg-6) and

Section 1302, captioned "Essential Health Benefit Requirements" (42 U.S.C. §18022).

Subsections (a) and (b) of Section 2707 require coverage for EHBs – including hospitalization and

emergency services – with strict limitations on annual cost sharing.  Section 2707(b) states:

> *(b) Cost-sharing under group health plans*
>
> A group health plan shall ensure that any annual cost-sharing
> imposed under the plan does not exceed the limitations provided for
> under paragraphs (1) and (2) of section 1302(c).

21.     Section 1302(c)(1) and (2), in turn, establish annual limits on "cost-sharing

incurred under a health plan with respect to self-only coverage or coverage other than self-only

coverage" in 2014 and subsequent years.  This includes the plan year for the Patient at issue,

which is 2015.  For these purposes, "cost-sharing" is defined to include "deductibles, coinsurance,

copayments, or similar charges" and any other expenditures required of an insured individual

which is a qualified medical expense (within the meaning of section 223(d)(2) of title 26 **with

respect to essential health benefits covered under the plan**."  *See* ACA Section 1302(c)(3)(A)

(emphasis added).

22.     EHBs are defined broadly and specifically to include, among other things,

[2] *See* ACA Section 1302(c)(4); *see also* Departments of Labor, Health and Human Services, and Treasury, ACA Implementation FAQs Set 18, January 9, 2014, available at https://www.dol.gov/ebsa/faqs/ or at https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/aca_implementation_faqs18.html.

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1230591.1

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1   hospitalization and emergency services.  *See* ACA Section 1302(b).  Read together with Sections

2   2707(b) and 1302(c), these provisions evidence a clear intent by Congress to require complete

3   coverage of such EHBs when they are offered by a health plan, not just coverage at a very

4   minimal substandard level that is calculated never to reach anywhere near any of the bills.

5         23.      ACA's MOOP provisions apply directly to self-funded ERISA plans.  Section 715

6   of ERISA, (29 U.S.C. § 1185d), which was added by ACA Section 1563(e), incorporates the

7   provisions of part A of title XXVII of the PHS Act – including ACA Section 2707.

8

9   **Defendants Applied Wholly Improper, Arbitrary, and Capricious Interpretations of the**

10   **Plan to Eviscerate the Patient's Coverage for the Services Rendered by the Hospital**

11         24.      After the services were rendered the Defendants intentionally, improperly,

12   arbitrarily and capriciously interpreted the written document that governs the Plan in order to

13   grossly underpay the Hospital on the Patient's medical bills, in several ways:

14

15   **Defendants Failed to Honor the MOOP**

16         25.      Despite the MOOP threshold agreeing to "pay 100% of any further Covered

17   Medical Expenses incurred during the remainder of that Calendar Year," Defendants have

18   administered the MOOP in a manner that effectively renders this an empty promise.

19         26.      Defendants do so by starting with the unsupported assumption that they never have

20   to pay more than 120% of the rates that the federal government pays under the Medicare program

21   – ever.  This makes the MOOP illusory since 120% of Medicare rates represent just a fraction of

22   the standard charges by the Hospital and all other hospitals in this geographic area (as well as

23   many others).

24         27.      From this improper starting point, Defendants nullify the Plan's MOOP provision

25   in at least two ways.  <u>First</u>, Defendants only allow a fraction of patients' out-of-pocket liability to

26   qualify for the $6,350 MOOP threshold.   Specifically, Defendants have taken the position that the

27   $6,350 limit is not "met" until after the patient's financial liability exceeds hundreds of thousands

28   of dollars.  <u>Second</u>, even after Defendants finally deem the MOOP to be met, Defendants still

1  cover a small fraction of the patient's bill – e.g., 120% of Medicare rates– still leaving the patient

2  exposed to the rest of the bill.

3      28.    Defendants' unsustainable interpretations defeat the entire purpose of having a

4  MOOP.  The purpose of the MOOP is to protect patients against bills exceeding the MOOP

5  threshold.  Nothing in the Plan disclosed that the MOOP threshold has limitations and exclusions

6  that will eviscerate it for hospital services, which per ACA is one of the EHBs that must be

7  covered by the MOOP.

8      29.    Under the plain meaning of the plan documents, as well as under industry custom

9  and usage, the method by which the MOOP is met should be fairly simple.  Here's how it should

10  work.  The first $3,000 of the $892,269.79 is assigned directly to the Patient in order to satisfy the

11  Plan's deductible limit, and counts towards satisfying the $6,350 MOOP threshold.  The portion of

12  the bill above the $3,000 also counts towards satisfying the MOOP until the remainder of the

13  $6,350 threshold is met.  The amount of the bill above the MOOP is the full responsibility of the

14  plan since the deductible has been satisfied and the MOOP has been reached.

15      30.    However, Defendants severely limit what expenses Defendants counted for the

16  MOOP.  Specifically, Defendants assert that only the deductible, "co-insurance," and "co-

17  payments" count toward the MOOP threshold.  In doing so, Defendants ignore hundreds of

18  thousands of dollars of the Patient's medical bills before deeming the MOOP threshold to have

19  been met.

20      31.    The following is an excerpt from the Explanations of Benefits (EOB) form issued

21  and relied upon by the Defendants to the Hospital for the Patient, which illustrates how

22  Defendants attempted to "game" the Plan's MOOP limit. The first three lines reflect three separate

23  charges for the Patient's medical care, in the amounts of $33,208.00, $119,340.00, and $74,431.00

24  (see the "Total Charge" column).  The total of these three charges are $226,979.00  It is not until

25  the Patient incurred these $226,979.00 in Hospital charges – nearly a quarter of the Hospital's

26  entire bill for his/her stay – that Defendants considered the $6,350 MOOP to be met.  The

27  paragraphs directly below walk through Defendants' twisted math:

28

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1230591.1

1

2

3

Date:  04/20/2015

Claim#:
Patient:

Patient#:
Provider: REGIONAL MEDICAL CENTER

| Dates of Service | Service Code | Total Charge | Ineligible Amount | Reason Code | Discount Amount | Eligible Expense | Deductible Amount | Co-pay Amount | Balance Amount | Paid At | Payme Amou |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 03/__-03/__/2015 | 10 | $33,208.00 | $0.00 | WH | $30,385.32 | $2,822.68 | $0.00 | $0.00 | $2,822.68 | 80% | $2,258. |
| 02/__-02/__/2015 | 10 | $119,340.00 | $0.00 | WH | $109,196.10 | $10,143.90 | $0.00 | $0.00 | $10,143.90 | 80% | $8,115. |
| 02/__-03/__/2015 | 10 | $74,431.00 | $0.00 | WH | $68,104.36 | $6,326.64 | $0.00 | $0.00 | $2,334.15 | 80% | $1,867.32 |
|  |  | $0.00 | $0.00 |  | $0.00 | $0.00 | $0.00 | $0.00 | $3,992.49 |  | $3,992.49 |
| 03/__-03/__/2015 | 12 | $4,919.00 | $0.00 | WH | $4,500.88 | $418.12 | $0.00 | $0.00 | $418.12 | 100% | $418.12 |
| 02/__-03/__/2015 | 12 | $4,771.00 | $0.00 | WH | $4,365.46 | $405.54 | $0.00 | $0.00 | $405.54 | 100% | $405.54 |
| 02/__-03/__/2015 | 12 | $16,041.00 | $0.00 | WH | $14,677.52 | $1,363.48 | $0.00 | $0.00 | $1,363.48 | 100% | $1,363.48 |
| 02/__-03/__/2015 | 12 | $26,126.00 | $0.00 | WH | $23,905.29 | $2,220.71 | $0.00 | $0.00 | $2,220.71 | 100% | $2,220.71 |

32.     For the charges on the EOB's first line, $33,208.00, Defendants calculate how those charges would be paid at 120% of Medicare rates, which is $2,822.68 – what they deem to be the "Eligible Expense."  Defendants then proceed to pay 80% of the Eligible Expense, or $2,258.14.  Defendants allocate the remaining 20%, which equals just $564.54, as the Patient's "co-insurance" for the $33,208.00 charge.  Defendants then count just $564.54 towards the $6,350 MOOP threshold.  But the Patient, of course, still has a bill from the Hospital for the actual amount of the charges on the first line, $33,208.00, minus the $2,822.68 that the Plan paid toward these charges, leaving the Patient on the hook for the remaining $30,385.32.

33.     For the charges on the EOB's second line, $119,340, Defendants calculated an Eligible Expense at 120% of Medicare rates of only $10,143.90.  Defendants paid 80% of this amount ($8,115.12), assigned the remaining 20% to the Patient's co-insurance ($2,028.78), and only counted the $2,028.78 in co-insurance towards the MOOP.  But the Patient's real balance for the charges on this second line was the remaining $109,196.10.

34.     It was only after Defendants reached the charges on the third-fourth lines on the EOB, $74,431.00, that Defendants considered the MOOP to be met.  Defendants calculated an Eligible Expense at 120% of Medicare rates to be only $6,326.64.  The third line of the EOB shows part of these charges still treated as under the MOOP threshold, with the fourth line showing the other part of these charges finally being enough to exceed the MOOP threshold. Specifically, for the first $2,334.15 of these particular Eligible Expenses, Defendants paid $1,867.32 (80%) and assigned $466.83 to the Patient's co-insurance (20%).  Defendants also ignore the $68,104.36 balance of the charges on the third line that the Plan did not pay.  Then, with the unpaid charges for these three lines already well exceeding $200,000, Defendants on the

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

9

1230591.1

1  fourth line treat the MOOP as satisfied.  (*See* fourth line of excerpt from EOB.)

2  35.  In other words, according to Defendants, the Patient did not meet the $6,350

3  MOOP threshold until the Patient incurred $226,979.00 in hospital charges.  Defendants'

4  miscalculation improperly leaves the Patient financially responsible for this amount, which far

5  exceeds the actual MOOP threshold stated in the Plan.

6  36.  Moreover, even after the MOOP finally "kicks in," Defendants still take the

7  position that the Plan covers only 120% of Medicare, rather that covering the entire portion of the

8  bill above the MOOP.  This is reflected by the subsequent lines of the EOB, which reflect Hospital

9  charges that have been "Paid at" 100%, yet still not paying more than 120% of Medicare.  What

10  the EOB tries to obscure is that Defendants are not really covering 100% of the bill above the

11  MOOP at all, and that they continue to leave the Patient on the hook for the remainder above the

12  MOOP.  Under Defendants' absurd implementation, the only thing that changes after the Plan's

13  MOOP is met is that the Plan increases the level of payment from 96% of Medicare rates (e.g.,

14  80% of *120% of Medicare*) to 120% of Medicare (100% of *120% of Medicare*). Since the charges

15  of all hospitals in the area are well above 120% of Medicare, this means Defendants' untenable

16  math always leaves the Patient on the hook for the vast bulk of hospital bills, for this Hospital and

17  any other hospital, including bills for ACA protected EHBs.

**Defendants Improperly Relied Upon Unenforceable, Inadequately Disclosed**

**Plan  Provisions To Avoid Paying the Reasonable and Customary Charges**

20  37.  Defendants also have violated the legal requirement that an SPD "shall be written

21  in a manner calculated to be understood by the average plan participant."  29 U.S.C. § 1022.  The

22  regulations enforcing this statute unambiguously require that limitations and exclusions not be

23  minimized or obscured, stating:

> General format.  The format of the summary plan description **must not have the effect to misleading, misinforming or failing to inform** participants and beneficiaries.  **Any description of exception, limitations, reductions, and other restrictions of plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant**.  Such exceptions, limitations, reductions, or restrictions of plan benefits shall be described or summarized in a manner **not less prominent** than the style, captions, printing type, and

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1   prominence used to describe or summarize plan benefits.  The
2   advantages and disadvantages of the plan shall be presented **without either exaggerating the benefits or minimizing the limitations**.

3   29 C.F.R. § 2520.102-2(b) (emphasis added).

4         38.      Furthermore, the regulations only permit limitations and exclusions to be stated in a

5   separate place from the benefits if the SPD expressly sets forth in the benefits section the specific

6   page where the pertinent limitations and exclusions can be found.   Specifically, the regulation

7   instructs as follows:  "The description or summary of restrictive plan provisions need not be

8   disclosed in the summary plan description in close conjunction with the description or summary of

9   benefits, **provided that adjacent to the benefit description the page on which the restrictions**

10  **are described is noted**."  (*Id*. (emphasis added).)

11        39.      Defendants' interpretation of the SPD relies on assertions about the language that,

12  were those assertions the Plan's intent, then the SPD would not be in compliance with these

13  requirements either.

14        40.      The preamble in the SPD trumpets to readers that "[i]t has been carefully designed

15  to provide excellent benefits . . . for you and your family."  (SPD at p.3.)  This Plan document also

16  purports to pay 80% of "covered expenses" for inpatient hospital care, once a patient's calendar

17  year deductible of $3,000 is met.  (*Id*. at p. 4 (Schedule of Benefits); *id.* at p. 8 (Inpatient Hospital

18  benefits).)  The SPD does not provide any disclosure near these statements that the Plan will

19  actually not pay for needed hospital care at any more than 80% of a minimal, fixed amount that is

20  based on Medicare rates, or identify any specific page with a limitation to it.

21        41.      The Plan defines "Covered Medical Expenses," in turn, as "Reasonable and

22  customary charges incurred by . . . a Covered Person."  (*Id*. at p. 28.)  The Plan confirms that

23  "Hospital Room and Board" and other hospital-related services are Covered Medical Expenses.

24  (*Id*.)   Again, the Plan does not provide any disclosure near this statement, or any page reference

25  to a limitation, that if the beneficiary needs hospital care, the "Expenses" that are actually

26  "Covered" will only be a small fraction of what a patient will actually need.

27        42.      Moreover, the phrase "Reasonable and Customary" is well known in the health

28  insurance industry through custom and usage as a concept that signifies the standard billed charges

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1230591.1

1    by the provider and other providers for the same or similar medical services in the geographic area.

2    This is the manner that the average plan participant would understand such language to mean.

3        43.      Elsewhere in the document, the Plan also parallels this industry custom and usage

4    in the following passage:

> **REASONABLE AND CUSTOMARY FEE LIMITATION** – An amount measured and determined by comparing the actual charge with **the charges customarily made for similar services and supplies to individuals of similar medical conditions in the locality concerned**. The term "locality" means a county or such greater geographically significant area as is necessary to establish a representative cross section of persons, or other entities **regularly furnishing the type of treatment, services or supplies for which the charge was made.**

10    (*Id.* at p. 63-64 (emphasis added).)  But then, far away from the earlier cited language about the

11    Plan's excellent benefits, 80% coverage before the MOOP, 100% coverage after the MOOP, and

12    Covered Medical Expenses, the document adds more obliquely:

> Reasonable and Customary charges may, at the Plan Administrator's discretion, alternatively be determined and established by the Plan using normative data such as, but not limited to, Medicare cost to charge ratios, average wholesale price (AWP) for prescriptions and/or manufacturer's retail pricing (MRP) for supplies and devices.  (*Id.*)

16        44.      This Reasonable and Customary limitation was not disclosed by the Plan to the

17    Hospital when benefits were verified and authorized.  But even if it had been disclosed, there is

18    nothing in it adopting Medicare rates.

19        45.      When these provisions are read together, they should establish that the Plan's

20    baseline level of payment is 80% of the prevailing level of charges made by providers for the same

21    or similar medical services in the same geographic area before the MOOP; and then 100% after

22    the MOOP.[3]

23        46.      The Hospital is informed and believes that Defendants interpret the language of the

---

[3] This Reasonable and Customary limitation also differs from what the Plan told the Hospital on the phone, which was only that the Plan would pay "80%" of medical expenses up to the MOOP, and that the MOOP was $6,350.  The Hospital reasonably took the Plan's telephonic verification to mean 80% of the Patient's hospital bill, not 80% of an undisclosed 120% of Medicare.  The Hospital only learned about the alleged further limitations tied to Medicare after the care already had been rendered to the Patient, the Patient no longer was at the Hospital, and the bill had been submitted.

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1   plan in such a way that hospitals virtually never would actually receive "Reasonable and

2   Customary" payment as that term is defined in the above-quoted language from the Plan

3   document.  They always will receive a much, much lower payment – *i.e.*, no more than 120% of

4   Medicare – which virtually always will be just a fraction of what hospitals charge in this

5   geographic area.  On information and belief, Defendants justify this illegitimate position using

6   *another* set of provisions in the Plan that are located yet elsewhere in the documents, not near the

7   other language discussed above, and with no specific page reference.  These other provisions

8   relate to what the Plan calls "Allowable Claim Limits."

9          47.     Specifically, and contrary to the other terms of the SPD, there is a provision that

10  reads:  "The Allowable Claim Limit for charges by a Hospital facility . . . shall be based upon

11  120% of Medicare allowed amount for the services in the geographic region, or when no Medicare

12  pricing amount is available, 50% of Billed Charge."  These provisions are in a different part of the

13  Plan document (SPD p. 19).

14         48.     An average beneficiary who reads the other benefits provisions of the SPD on the

15  other pages would not naturally be drawn to this differently located language.  Moreover, the other

16  provisions establishing broader coverage for benefits do not state the page where this additional

17  alleged exception, limitation, reduction or restriction is located.

18         49.     This aspect of the Plan also is inconsistent with and contradicts other language in

19  the SPD discussed above.  For example, the Plan defines "Reasonable and Customary" elsewhere

20  in a way that signals that the Plan will cover an amount that is comparable to what providers in a

21  given geographic region charge for the same or similar services, and the Plan also limits the

22  Patient's overall exposure to bills exceeding the MOOP.  But Defendants' interpretation would

23  wash away those other provisions.

24         50.     Reading the Plan as a whole, a reasonable beneficiary simply would not expect that

25  the Plan *actually* covers only a small fixed amount for hospitalization or emergency services.  Nor

26  would a reasonable beneficiary expect that, contrary to the Plan's clear and unambiguous

27  provision limiting out-of-pocket liability to $6,350 for an individual, their annual out-of-pocket

28  exposure is, in fact, in the high five-to-six figure range.

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

13
COMPLAINT

51.     Defendants have abused their discretion by interpreting the Plan provisions so that hospital services are never paid at more than 120% of Medicare rates, even when the MOOP has been met, and even when no hospitals in the area has set their charges at 120% of Medicare.

52.     The Allowable Claim Limits provisions also violate ERISA's mandate that the Summary Plan Description "shall be written in a manner calculated to be understood by the average plan participant." 29 U.S.C. § 1022.  The references to "Covered Medical Expenses" (p. 27-28) and "Reasonable and Customary charges" (p.63) are not anywhere near the definition of Allowable Claim Limits (p. 19).  The Medicare-based limitation in the Allowable Claims Limits on coverage is nearly 10 pages away from the definition of Covered Medical Expenses, and nearly 45 pages away from the definition of Reasonable and Customary – in a densely worded single spaced document of around 85 total pages.  Even if a beneficiary were to happen to see *and* piece together these disparate parts of the document, the only reasonable interpretation for the beneficiary to reach would be that (a) Covered Medical Expenses actually are covered; (b) any limitations below the amount billed are overcome once the MOOP is reached; and (c) any buried limitations are not intended to trump the otherwise broadly stated coverage or the legally mandated MOOP.

53.     The Allowable Claim Limits provisions are unenforceable under ERISA, and Defendants have abused their discretion in relying on such provisions to avoid paying at least the Reasonable and Customary benefits set forth by the plan, which is defined in the SPD as based on charges by the actual Hospital and other hospitals in the area, not based on 120% of Medicare.

**The Plan Cannot Avoid Its Obligations Based On the Assertion that**

**the Patient Should Have Gone To An "In-Network" Hospital**

54.     Amazingly, Defendants responded to a demand letter that the Patient should have gone to an "in-network" hospital to reduce the Patient's exposure.  This assertion fails for at least two reasons.  First, the Plan has no in-network hospitals – not in San Jose or anywhere else. Defendants intentionally set up a Plan structure where there is no network at all.  Accordingly, there is no such thing here as an in-network hospital option for the Patient to select.  Likewise, by

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1230591.1

1   definition, no such thing here as an out-of-network hospital.  The concept of in-versus-out-of-

2   network for provider types only exists for situations when there is a network of such provider

3   types.

4       55.     Second, the Patient arrived at the Hospital due to an emergency.  ACA does not

5   permit health plans to leave members with higher exposure for emergency care.  Therefore, the

6   Patient was not at the Hospital, or for that matter any hospital, by choice.  Thus, any argument that

7   this Patient should have chosen to go in-network appears to be nothing more than an illegitimate

8   attempt to avoid the MOOP and/or to avoid ACA's requirements regarding situations involving

9   emergency care.  The MOOP limitation cannot be avoided by failing to have any network of

10  providers with respect to offered EHBs.

11

12  **The Plan, Through Its Representatives, Promised to Pay Almost All of the Patient's Bills,**

13  **and Failed to Disclose Any of the Coverage Limitations It Now Seeks to Impose**

14      56.     Defendants have also violated the promises they made directly to the Hospital

15  during the patient's inpatient stay, to pay for nearly all of the Hospital's bills.

16      57.     For example, in or around early March, 2015, when the Patient was still at the

17  Hospital, the Hospital called the Plan to verify benefits.  A representative for the Hospital spoke to

18  a Plan representative named "Genevieve."  The Plan, through "Genevieve," verified that the

19  Patient's coverage with the Plan was active, and that the patient was eligible from January 1, 2015,

20  through the present.  The Plan also confirmed that it would cover 80% of Patient's inpatient

21  hospital stay.  And it stated that there was a $3,000 deductible that had not then been met, and a

22  MOOP of $6,350 that had not yet been met.  The Plan also provided a specific authorization

23  number for Patient's inpatient care, which the Hospital recorded as "508668."

24      58.     The customary meaning of the Plan's representations was that the Plan would pay

25  80% of the Hospital's total bill until the $6,350 MOOP limit was reached; above which the Plan

26  would pay 100% of the Hospital's charges.

27      59.     Defendants did not identify any limitations or exclusions when authorizing the care

28  or verifying the benefits for the Hospital.  At no point during these conversations did they tell the

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1230591.1

1   Hospital that the Plan would not pay more than 120% of Medicare for hospital services.  They also

2   never disclosed that the Plan had a purported limitation buried in the undisclosed documents based

3   on an amorphous Medicare-based limitation that supplanted for hospital services the broader

4   definition in the Plan of the term "Reasonable and Customary."  The verification and authorization

5   statements by the Plan never even mentioned a purported Reasonable and Customary limitation or

6   exclusion.  Nor did Defendants explain that they interpreted this undisclosed "Reasonable and

7   Customary" provision to really mean a strict upper limit of 120% of Medicare rates for any and all

8   hospital services.

9        60.    Nor are the rates paid by Medicare consistent with the industry custom and usage

10   meaning of "Reasonable and Customary."

11       61.    The Hospital had no reason to expect, based on Defendants' representations, that

12   the Plan would really only pay at 120% of Medicare rates.  Medicare is a special federal

13   government program that provides coverage to the elderly and certain disabled persons at rates

14   imposed by the federal government.  Medicare rates were not designed to apply to non-Medicare

15   beneficiaries.  Medicare rates were designed to pay for only the costs associated with rendering

16   care to the limited population of Medicare beneficiaries.  The Hospital is informed and believes

17   that the federal government does not set Medicare rates based on market value and does not intend

18   to set them based on market value.  Indeed, the California Department of Managed Health Care

19   ("DMHC") has found that Medicare rates are designed to pay less than customary and reasonable

20   rates as that term is defined for California's parallel health care benefit plans.

21       62.    On the other hand, the terms reasonable and customary in the health care industry

22   has its origins in fair market value concepts based on what competitors in the area charge for

23   similar services.  The charges of the Hospital and other California hospitals in the area are a matter

24   of public record that gets published each year through the California Office of Statewide Health

25   Planning and Development ("OSHPD").  Accordingly, Defendants knew or should have known

26   that the charges of the Hospital are consistent with the charges of other hospitals in the San Jose

27   area, and that all hospitals in the area charge many times more than the government's rates for

28   services to those who qualify for Medicare benefits.

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1230591.1

63.     Defendants also did not disclose to the Hospital during the verifications and authorizations any alleged limitation or exclusion upon the plan's stated $6,350 MOOP.  For instance, according to Defendants' arbitrary, capricious and previously undisclosed reading of the Plan, (a) the Patient would have to incur somewhere between $75,000 to $100,000 in actual, balance bill liability before the MOOP would be considered met, rather than just the stated MOOP limitation of $6,350; and (b) even after the Plan considered the MOOP met using this absurd reading the Plan still only would cover 120% of Medicare rates for the Patient's bills, leaving the Patient to incur substantial out-of-pocket liability far above the MOOP.  These concepts were not disclosed when the Hospital obtained verification and authorization.

64.     Likewise, at no point did Defendants tell the Hospital that the Plan's undisclosed cap on payment at 120% of Medicare would trump the stated $6,350 MOOP for the year 2015. And there is no reason why it should since doing so would eviscerate the MOOP.


## FIRST CAUSE OF ACTION

### (ERISA Section 502(a)(1)(B))

(Against All Defendants)

65.     Hospital incorporates all allegations set forth in the above paragraphs.

66.     The Hospital is both the assignee of the Patient's benefits.  The Hospital also is the authorized representative of the Patient.  Specifically, the Patient signed a "Conditions of Admission" form that included the following language:

> **Assignment of Benefits.  Patient assigns all of his/her rights and benefits under existing policies of insurance** providing coverage and payment for any and all expenses incurred as a result of services and treatment rendered by the Provider and authorizes direct payment **to the Provider** of any insurance benefits otherwise payable to or on behalf of Patient for the hospitalization or for outpatient services, including emergency services, if rendered.  Patient understands that any payment received from these policies and/or plans will be applied to the amount that Patient or Guarantor has agreed to pay for services rendered during this admission and, that Provider will not retain benefits in excess of the amount owed to the Provider for the care and treatment rendered during the admission.
>
> I understand that any health insurance policies under which I am covered may be in addition to other coverage or benefits or recovery

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

to which I may be entitled, and that Provider, by initially accepting health insurance coverage, does not waive its rights to collect or accept, as payment in full, any payment made under different coverage or benefits or any other sources of payment that may or will cover expenses incurred for services and treatment.

I hereby irrevocably appoint the Provider as my authorized representative to pursue any claims, penalties, and administrative and/or legal remedies on my behalf for collection against any responsible payer, employer-sponsored medical benefit plans, third party liability carrier or, any other responsible third party ("Responsible Party") for any and all benefits due me for the payment of charges associated with my treatment.  This assignment shall not be construed as an obligation of the Providers to pursue any such right of recovery.  I acknowledge and understand that I maintain my right of recovery against my insurer or health benefit plan and the foregoing assignment does not divest me of such right.

I agree to take all actions necessary to assist the Provider in collecting payment from any such Responsible Party should the Provider(s) elect to collect such payment, including allowing the Provider(s) to bring suit against the Responsible Party in my name.  If I receive payment directly from any source for the medical charges associated with my treatment acknowledge that it is my duty and responsibility to immediately pay any such payments to the Provider(s).

67.     Accordingly, the Hospital is entitled under ERISA to pursue all payment that are due to the Patient under the Plan.

68.     The Hospital diligently pursued all internal appeals available under the Plan and exhausted all appeal remedies.  In doing so, the Hospital corresponded directly with the Defendant entities that the Plan held out to be the correct entities to communicate with regarding the failure to pay the whole bill.  First, the Hospital communicated with defendant Benefit Administrative Systems, who, among other things, denied the Hospital's second level of appeal on or around September 16, 2015.

69.     BAS asserted that the Plan supposedly could not pay more than 120% of Medicare under the terms of the governing SPD.  This assertion, however, is undercut by what happened next.

70.     In or around December 2015, the Hospital's administrators received a call from Defendant The Phia Group, who purported to act on behalf of the Plan's administrators.  Over the next several months, The Phia Group offered to resolve the matter by having the Plan pay an

1   additional amount that, while still far less than the total bill, was several times more than 120% of

2   Medicare.   This offer undercuts the notion that Defendants truly believe that 120% of Medicare

3   rates is a hard limit on what the Plan can pay.

4   71.   Subsequently, the Hospital escalated this matter to its outside counsel who

5   communicated with all of the Defendants other than The Phia Group.  But still Defendant The

6   Phia Group is the one who responded.

7   72.   The Phia Group's formal role with respect to the Plan is unclear.  In a letter dated

8   November 25, 2016, for instance, The Phia Group asserted that it was "not the Administrator of

9   the Plan, as that term is defined by ERISA,"  and "not a Plan fiduciary," and "neither assumed nor

10   exercised any right to interpret the provisions contained within the Plan."  The Hospital has no

11   way to test or deny these assertions at this stage.  But if Phia is none of these things, then Phia

12   appears to be just an outside party intentionally interfering with the Hospital's right to get payment

13   from the Plan and Plan Administrator.

14   73.   In sum, the Hospital has pursued all available levels of internal appeal under the

15   Plan with respect to the Patient's medical care.  Such appeals have now been exhausted.  Despite

16   pursuing all appeals, and despite further correspondence with Defendants after the exhaustion of

17   such appeals, Defendants refused to reconsider their decision not to pay the Patient's bill.

18   74.   Defendants' (a) refusal to pay more than 120% of Medicare, and further, (b)

19   substitution of the "Reasonable and Customary" level of payment called for under the Plan with

20   payment at 120% of Medicare in every instance; was arbitrary and capricious and an abuse of

21   discretion, to the extent that Defendants were delegated discretion under the Plan.

22   75.   In addition, Defendants' reliance on the Allowable Claim Limits provisions was

23   arbitrary and capricious, because the provisions (1) conflict with the MOOP; (2) conflict with the

24   Plan's definition of Reasonable and Customary, and (3) violate ERISA's regulations with respect to

25   SPDs by not being properly disclosed in a way that was clear and proximate to the other coverage

26   provisions.  Therefore the 120% of Medicare limitation is unenforceable as a matter of law.

27   76.   Defendants' misinterpretation of the $6,350 MOOP limit set forth in the Plan –

28   both as to what amounts count towards that limit, and the level of payment by the Plan after that

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1230591.1

1    limit is met – also constitute arbitrary and capricious behavior and abuses of discretion, again, to

2    the extent that Defendants were delegated discretion under the Plan.

3         77.    The Hospital is entitled to payment at its full billed charges, which it contends, and

4    will prove at trial, are Reasonable and Customary within the meaning of the Plan.

5         78.    The Hospital also is entitled to its reasonable attorneys' fees under ERISA, given

6    Defendants' repeated insistence on adhering to their unjustifiable interpretations of the Plan.

7         79.    Finally, the Hospital reserves all its rights under ERISA, including the right to

8    balance bill the Patient's estate, notwithstanding any language in the Plan that purports to force the

9    Hospital to give up such rights.

10                          **SECOND CAUSE OF ACTION**

11              **(ACA Section 2707(b) via ERISA Section 502(a)(1)(B))**

12                            (Against All Defendants)

13        80.    Hospital incorporates all allegations set forth in the above paragraphs.

14        81.    The Hospital proceeds on this cause of action under ERISA pursuant to an

15   assignment of benefits it has obtained to the Patient, as alleged above.

16        82.    In the alternative, and to the extent that the Plan's interpretation of the MOOP

17   provision contained in the Plan is not held to be an abuse of discretion and/or to violate ERISA,

18   the Plan has nevertheless violated ACA's mandate that self-funded ERISA plans offer a MOOP

19   applicable to all offered EHBs of no more than $6,600 in calendar year 2015.

20        83.    ERISA is an appropriate mechanism for the enforcement of the federal ACA

21   requirements imposed on self-funded ERISA plans.  *See, e.g.*, 29 U.S.C. § 1185d (incorporating

22   the provisions of part A of title XXVII of the PHS Act, including ACA Section 2707, into

23   ERISA); *see also Harlick v. Blue Shield of Cal.*, 686 F.3d 699 (9th Cir. 2012) (en banc) (enforcing

24   substantive coverage requirements imposed by Mental Health Parity Act upon ERISA plans).

25        84.    The Hospital therefore, and in the alternative, seeks payment of the entire bill

26   above the MOOP for the Patient's stay in a manner consistent with ACA's $6,600 MOOP limit for

27   calendar year 2015, as further lowered by the Plan's own language setting the MOOP here at

28   $6,350.  Specifically, all out-of-pocket cost sharing amounts, including balance billing, must count

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1  towards the MOOP limit.  After the MOOP limit is met, the Plan must pay 100% of the Hospital's

2  charges.

3       85.     The Hospital also is entitled to its reasonable attorneys' fees under ERISA.

4       86.     Finally, the Hospital reserves all its rights under ERISA, including the right to

5  balance bill the Patient's estate, notwithstanding any language in the Plan that purports to force the

6  Hospital to give up such rights.

7                        **THIRD CAUSE OF ACTION**

8                        **(Intentional Misrepresentation)**

9              (Against BAS, WH Administrators, RHC Management, and the Plan)

10      87.     Hospital incorporates all allegations set forth in the above paragraphs.

11      88.     As alleged above, the Plan, through one or more of the Defendants, affirmatively

12  represented to the Hospital that it would cover 80% of the patient's inpatient hospital expenses,

13  subject to a $3,000 deductible and a $6,350 MOOP.  Defendants never stated any of the

14  limitations or exclusions at the time, which they subsequently have sought to apply to pay far less.

15  Stating the coverage without stating the alleged limits and exclusions to that coverage made the

16  coverage statements misleading and the concealments into omissions of material facts.

17      89.     At the times that these representations and concealments occurred, Defendants

18  knew that the representations were false under Defendants' interpretation of the concealed parts of

19  the SPD, and knew that they intended never to pay more than 80% of a much smaller base

20  amount, e.g., 120% of Medicare rates, or to comply with the MOOP.  Defendants' statements also

21  were materially misleading because they failed to disclose that 80% would be calculated not based

22  on the Hospital's full billed charges, but based on a much smaller, arbitrary, and inadequate level

23  of payment.   Defendants nonetheless made these representations knowing that they were false,

24  and/or made recklessly and without regard for their truth.

25      90.     The Hospital reasonably relied upon Defendants' representations that the Plan

26  would pay 80% of the Patient's bill for hospital services prior to the MOOP limit being met, and

27  then 100% after the MOOP limit was met.  At no point did Defendants explain to the Hospital that

28  the Plan purported to have a limitation or exclusion on benefits, whereby the Plan would not pay

1  more than 120% of Medicare for all of the hospital services.

2      91.    The Hospital was substantially harmed when Defendants instead chose to pay just

3  8% of the cost of the Patient's care.

4      92.    The Hospital brings this cause of action in its own right, and not on behalf of the

5  Patient.  This cause of action is distinct and separate from the ERISA causes of action, and is not

6  preempted by ERISA.  *See, e.g.*, *The Meadows v. Employers Health Ins.*, 47 F.3d 1006 (9th Cir.

7  1995) (holding provider misrepresentation claims not preempted); *Morris B. Silver M.D., Inc. v.

8  Int'l Longshore & Warehouse Union—Pacific Mar. Ass'n Welfare Pla*n, 206 Cal.Rptr.3d 461,

9  469-471 (2016) (same); *Mem'l Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236 (5th Cir.

10  1990) (same).

11      93.    Accordingly, the Hospital seeks 80% of its inpatient hospital charges prior to the

12  MOOP limit being met, and then 100% of its inpatient hospital charges after the limit was met,

13  consistent with Defendants' promises to the Hospital.

14  <u>**FOURTH CAUSE OF ACTION**</u>

15  **(Negligent Misrepresentation)**

16  (Against BAS, WH Administrators, RHC Management, and the Plan)

17      94.    Hospital incorporates all allegations set forth in the above paragraphs.

18      95.    As alleged above, the Plan, through one or more of the Defendants, affirmatively

19  represented to the Hospital that it would cover 80% of the patient's inpatient hospital expenses,

20  subject to a $3,000 deductible and a $6,350 out-of-pocket maximum.  Defendants never stated any

21  of the limitations or exclusions at the time which they subsequently have sought to apply to pay

22  far less.

23      96.    At the times that these representations were made, Defendants had no reasonable

24  basis for believing that they were true.  Defendants knew that they intended never to pay more

25  than 80% of a much smaller base amount, e.g., 120% of Medicare rates.  Defendants' statements

26  were materially misleading because they failed to disclose that 80% would be calculated not based

27  on the Hospital's full billed charges, but based on a much smaller, arbitrary, and inadequate level

28  of payment.

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1230591.1

97.     The Hospital reasonably relied upon Defendants' representations that the Plan would pay 80% of inpatient hospital expenses prior to the MOOP limit being met, and then 100% of inpatient hospital expenses after the MOOP limit was met.  At no point did Defendants explain to the Hospital that the Plan purported to have a limitation or exclusion on benefits, whereby the Plan would not pay more than 120% of Medicare for all of the hospital services.

98.     The Hospital was substantially harmed when Defendants instead chose to pay just 8% of the cost of the Patient's care.

99.     The Hospital brings this cause of action in its own right, and not on behalf of the Patient.  This cause of action is distinct and separate from the ERISA causes of action, and is not preempted by ERISA.

100.    Accordingly, the Hospital seeks 80% of its inpatient hospital charges prior to the MOOP limit being met, and then 100% of inpatient hospital charges after the limit was met, consistent with Defendants' promises to the Hospital.

## FIFTH CAUSE OF ACTION

### (Intentional Interference With Contractual Relations)

#### (Against Defendants BAS and The Phia Group)

101.    Hospital incorporates all allegations set forth in the above paragraphs.

102.    This cause of action is pled in the alternative, to the extent that Defendants BAS and/or The Phia Group are not held to be fiduciaries of the Plan as that term is understood under ERISA.  Collectively, BAS and The Phia Group will be referred to as the Interfering Defendants.

103.    The Hospital is informed and believed that the Interfering Defendants have acted "behind the scenes" to encourage and influence the other Defendants into refusing to pay the Hospital.

104.    The Hospital is further informed and believed that the Interfering Defendants have run interference by, among other things, writing letters to Hospital counsel asserting aggressive and improper interpretations of the Plan.  This is even though Defendant The Phia Group, in particular, claims not to be a fiduciary of the Plan and not to have any authority to interpret any provision of the Plan.

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

105.    The Interfering Defendants knew that, due to the care that the Hospital provided to Patient, the Hospital had an economic relationship with the other Defendants in this case, which would have resulted in an economic benefit to the Hospital.  Specifically, the Interfering Defendants knew that one or more of the other Defendants had orally agreed with Hospital to pay for 80% of the Patient's care, up to the $6,350 MOOP limit, above which Defendants would pay for 100% of the Patient's care.

106.    The Interfering Defendants intended to disrupt, and did disrupt, this agreement and relationship.  The Hospital is informed and believes that The Phia Group's "modus operandi" – indeed, its entire business model – centers around encouraging others, like the Defendants, to deny payment for legitimate medical bills, and that is what Defendants did here.  The Hospital is likewise informed and believes that Defendant BAS is involved in similar efforts, and appears to collaborate with The Phia Group in such efforts on a regular basis.

107.    The Interfering Defendants have disrupted the Hospital's relationship with the other Defendants in a number of substantial ways.  For instance, The Phia Group has done so through written correspondence and other communication with Hospital counsel in which it repeatedly insisted that the $6,600 MOOP limitation imposed by ACA does not apply.  The Hospital is also informed and believed that Defendant The Phia Group has urged the other Defendants to likewise not apply the MOOP limitation that is mandated for ACA for calendar year 2015, based on faulty legal arguments advanced by Defendant The Phia Group.  The Hospital is informed and believed that Defendant BAS has worked closely with The Phia Group to ensure that the Hospital's claim was largely denied, and that BAS and The Phia Group were in frequent communication during the discussions that the Hospital had over the Plan's failure to pay.

108.    The Hospital has been damaged in an amount to be proven at trial, due to the additional and extensive efforts that it has been forced to pursue in order to obtain compensation the Patient's hospital charges – including, but not limited to, the significant additional legal costs, including attorneys' fees, that the Hospital has incurred and will incur to pursue the payment actually owed by the Plan.

109.    The Hospital further seeks punitive damages against the Interfering Defendants'

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1230591.1

1   knowing, deliberate, and improper behavior.

2

3      **WHEREFORE**, The Hospital prays for and demand judgment against the Defendants as

4   set forth above and as follows:

5      A.      On the First Claim for Relief under ERISA, for an order compelling Defendants to

6   immediately pay for the care provided to Patient in accordance with ERISA and the terms of the

7   Plan, based on a fair interpretation of Reasonable and Customary and the $6,350 MOOP limitation

8   in the plan, in the amount of $816,226.47, or alternatively, an amount to be proved at trial;

9      B.      On the Second Claim for Relief under ERISA and ACA, for an order compelling

10  Defendants to immediately and timely re-process the reimbursement claim for the care provided to

11  Patient in accordance with the ACA MOOP requirements for calendar year 2015, such that the

12  Plan must pay 100% of the Hospital's charges after accounting for the $3,000 Deductible, in the

13  amount of $816,226.47, or alternatively, in an amount to be proved at trial;

14     C.      On the Third Claim for Relief (Intentional Misrepresentation), for an order

15  requiring Defendants to Pay 80% of the Hospital's charges after accounting for the $3,000

16  Deductible, as well as 100% of the Hospital's charges above the $6,600 MOOP limit, in the

17  amount of $816,226.47, or alternatively, in an amount to be proved at trial, plus punitive damages;

18     D.      On the Fourth Claim for Relief (Negligent Misrepresentation), for an order

19  requiring Defendants to Pay 80% of the Hospital's charges after accounting for the $3,000

20  Deductible, as well as 100% of the Hospital's charges above the $6,600 MOOP limit, in the

21  amount of at least $816,226.47, or alternatively, in an amount to be proved at trial;

22     E.      On the Fifth Claim for Relief (Intentional Interference), an order requiring

23  Defendant The Phia Group and/or Defendant BAS to pay damages, in the amount of $816,226.47,

24  or alternatively, in an amount to be proved at trial, plus punitive damages;

25     F.      Awarding costs, including attorneys' fees to the full extent permitted under the law,

26  including without limitation, pursuant to ERISA and any other applicable law;

27

28

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

G.     And awarding such other relief as the Court deems just, proper and available under the law.

Dated:  June 9, 2017                          HOOPER, LUNDY & BOOKMAN, P.C.


By:    _____
              /s/ Eric D. Chan
              ERIC D. CHAN
Attorneys for REGIONAL MEDICAL CENTER OF
SAN JOSE

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

1230591.1

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Regional Medical Center of San Jose hereby demands trial by jury in this action of all issues so triable.

Dated:  June 9, 2017                         HOOPER, LUNDY & BOOKMAN, P.C.


By:  _____
                 */s/ Eric D. Chan*
                 ERIC D. CHAN
Attorneys for REGIONAL MEDICAL CENTER OF SAN JOSE

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

1230591.1